IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROVER PIPELINE LLC,

        Plaintiff,                                  17cv0170
                                                          ELECTRONICALLY FILED

               v.

ROVER TRACT NO. PA-WA-HL-004.500T
*COMPRISED OF PERMANENT EASEMENT(S)*
*TOTALING 0.9 ACRES, MORE OR LESS, AND*
*TEMPORARY EASEMENT(S) TOTALING 1.33 ACRES,*
*MORE OR LESS, OVER A PARCEL OF LAND IN*
*HANOVER TOWNSHIP, WASHINGTON COUNTY,*
*PENNSYLVANIA, TOTALING 49.571 ACRES, MORE*
*OR LESS,*

JAMES M. BUCHANAN AND DIANE ZACK
BUCHANAN FARM #4 LP

ET AL.,

        Defendants.


**MEMORANDUM OPINION**

      This condemnation case was brought by Plaintiff pursuant to the Natural Gas Act, 15 U.S.C. § 717 *et seq*., and 15 U.S.C. § 717f (h) and Federal Rule of Civil Procedure 71.1 ("Rule 71.1"). ECF 1. In its Complaint, Plaintiff sought an order of condemnation for a permanent pipeline, temporary work space, surface site, permanent and temporary road access, and other rights-of-way and easements, which would enable Plaintiff to enter, commence, and complete clearing, construction, and restoration efforts on Defendants' properties, while the amount of just compensation due to Defendants for the taking was resolved. *Id*. Subsequent to the filing of the

Complaint, most of the named Defendants reached a settlement with Plaintiff concerning just compensation, and thus, their claims were not adjudicated.

For those Defendants who could not reach a settlement with Plaintniff as to just compensation, this Court appointed a three-person Commission in accordance with Rule 71.1. Pursuant to the Court's Order and Rule 71.1, the Commission prepared a Report (ECF 108) containing findings of fact and conclusions of law and ultimately, arrived at the just compensation due and owing to the remaining landowner-Defendants by the Plaintiff.

Presently before the Court in this condemnation proceeding are Plaintiff's Objections to the Report of the Commission (ECF 111), as well as Defendant's Objections to the Report of the Commission (ECF 113). The Court will overrule all of the objections and adopt the Commission's Report in total. In so doing, while conducting its *de novo* review of the Commission's factual findings and conclusions of law to which the Parties objected, the Court relied heavily on the wisdom of the United States Supreme Court in *United States v. Merz*, 376 U.S. 192 (1964).

### I. Standard of Review

In accordance with Rule 71.1, this Court appointed a three-person Commission to determine just compensation given the character, location, and quantity of the property to be condemned, and for other just reasons. Fed.R.Civ.P. 71.1 (h)(2)(A). Rule 71.1 empowers the Commission to perform its duties with the authority of a master under Fed.R.Civ. P. 53(c) ("Rule 53"), and notes that Rule 53(d), (e), and (f) also applies to the Commission's actions and its Report. Fed.R.Civ.P. 71.1(h)(2)(D).

Rule 53 requires that the Court decide, *de novo,* all objections to findings of fact made or recommended by a master (in this case the Commission), unless the parties, with the Court's

approval, stipulate that: "(A) the findings will be reviewed for clear error; or (B) the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final." Fed.R.Civ.P. 53(f)(3). Neither occurred in this case, so this Court must review all objections in this matter *de novo,* and all objections to the Commission's rulings on procedural matters under an abuse of discretion standard. Fed.R.Civ.P. 53(f)(3-5).

In *Merz*, *supra*., the United States Supreme Court set forth guidelines for a Commission's report. *Id*., 376 U.S. at 198. Specifically, the *Merz* Court held that Commissioners "need not make detailed findings such as judges do who try a case without a jury[,]" but the Commissioners cannot merely issue conclusory findings. *Id.* The Commissioners must "reveal the reasoning they used in deciding on a particular award, what standard they tr[ied] to follow, which line of testimony they adopt[ed], what measure of severance damages they use[d], and so on." *Id.* The Supreme Court also noted that not "every contested issue raised on the record before the commission must be resolved by a separate finding of fact[,]" nor "that there must be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based." *Id.* The path followed by the Commissioners in reaching the amount of the award can, however, be distinctly marked. However, "[c]onclusory findings alone are not enough." *Id*. at 198.

The Commission in the instant case filed a comprehensive 15–page Report setting forth the path it took in reaching its valuation conclusion, the reasoning it employed, the testimony the Commissioners adopted, and other record evidence upon which it based its decision. ECF 108. The Court finds that this Report more than satisfies the requirements set forth in *Merz,* such that this Court may conduct a meaningful *de novo* review of the Commission's factual findings and conclusions of law.

## II. Background

As noted above, this condemnation case was brought by Plaintiff, ("Rover") pursuant to the Natural Gas Act, 15 U.S.C. § 717 *et seq*., and more specifically, 15 U.S.C. § 717f (h), and Federal Rule of Civil Procedure 71.1. ECF 1. In its Complaint, Rover sought an order of condemnation for a permanent pipeline, temporary work space, surface site, permanent and temporary road access, and other rights-of-way and easements, which would enable Rover to enter, commence, and complete clearing, construction, and restoration efforts on each of Defendants' properties, while the amount of just compensation due to Defendants for the taking was resolved. Id. Most of the named Defendants in the instant case reached just compensation settlements with Rover prior to Rover taking any further action.

The owner of two tracts of land could not settle with Rover, prompting Rover to file a Motion to Appoint a Commission pursuant to Rule 71.1. ECF 83. The owner of the two tracts of land, hereinafter "the Buchanan Farm," filed an Objection in Opposition to the Appointment of a Commission (ECF 86), and Rover filed a Response. ECF 87. This Court granted Rover's Motion to Appoint a Commission. ECF 89.

In its Order granting the Motion to Appoint a Commission, the Court explained its reasons for ruling in Rover's favor and appointing a Commission:

> Therefore, given the complex appraisal methodologies and valuation issues involved, and so as to ensure a more just, fair, and uniform determination of the Properties' valuation, this Court finds that compensation should be determined <u>by a Commission of three individuals who possess a background of knowledge sufficient to enable them to cope with the expert testimony which undoubtedly will be offered in bringing about a solution</u>.

> Moreover, if the case was tried by a jury, the burden on the time of the Court would be excessive and Parties entitled to the just compensation would not get justice as speedily as they would with a three-person Commission. In short, the compensation issues presented by this case can

be resolved more competently, consistently, and expeditiously by a
commission of three with experience in the field of land valuation than by
various lay persons who comprise a jury.

ECF 89, p. 5-6 (footnote omitted) (emphasis added).

Subsequent to publishing its Order indicating its intent to appoint a Commission in

accordance with Rule 71.1, the Court provided counsel for the parties with the names of the three

proposed Commissioners and allowed time for the parties' counsel to object to one or more of

the proposed Commissioners. In proffering names of potential Commissioners to the parties'

counsel, the Court considered the guidance provided by the 1985 Advisory Committee Note to

former Rule 71A (now Rule 71.1):

The amended Rule does not prescribe a qualification standard for
appointment to a commission, although it is understood that only persons
possessing background and ability to appraise real estate valuation
testimony and to award fair and just compensation on the basis thereof
would be appointed. In most situations the chairperson should be a lawyer
and all members should have some background qualifying them to weigh
proof of value in the real estate field and, when possible, in the particular
real estate market embracing the land in question.

Fed. R. Civ. P. 71(A)(h) advisory committee's note to 1985 amendment.

Based on the foregoing, the Court appointed three individuals to serve as Commissioners

in accordance with Rule 71.1: (1) Former Pennsylvania Court of Common Pleas Judge, Thomas

T. Frampton, of Goehring, Rutter and Boehm[1]; (2) Andrea Geraghty, Esquire, of Meyer Unkovic

and Scott[2]; and (3) LuAnn Datesh, Esquire, of Sherrard German and Kelly[3]. ECF 89. The Court

did not receive any objections to any of the three Commissioners named above. *Id.*

---

[1] As a Judge for the Mercer County Court of Common Pleas for ten years, Judge Frampton presided over hundreds
of jury trials. His alternative dispute resolution practice focuses on commercial and business disputes, medical
malpractice and other professional negligence, products liability, employment issues and personal injury. GOEHRING
RUTTER & BOEHM, https://www.grblaw.com/Attorney-Thomas-T-Frampton.

[2] Ms. Geraghty Andrea Geraghty focuses her practice in real estate law. With over 30 years of experience, she has
developed her career on the accumulation of knowledge from advising clients through land acquisition,
development, construction, access and rights of way, and management of a variety of real estate endeavors. She has

## A. Work Performed by the Commission

Shortly after the appointment, the Commission filed its first status report on March 27, 2018, with this Court.  ECF 99.  In this report, the Commissioners reported the work performed by them up and the parties in preparation for a hearing and a site inspection.  This interim status report reads in relevant part as follows:

> 3.   The Commissioners have held status conference calls with counsel for the parties and on October 17, 2017, the Commissioners provided a Case Management Order to counsel setting dates for the exchange of expert reports; the exchange of rebuttal expert reports and the deadline for the taking of expert depositions, as may be necessary.

> 4.   The parties submitted expert valuation reports, and thereafter, at the request of the Commissioners, submitted briefs by March 1, 2018, on the issue of valuation.

> 5.   A status conference was held on Thursday, March 15, 2018, at the office of the Commission Chairman.  Present for the conference were the three Commissioners, Defendant Diane Buchanan and her attorney Harry F. Kunselman, Esquire, and Brian J. Pulito, Esquire, counsel for Rover Pipeline, LLC.  Lawrence E. Bolind, Jr., Esquire, counsel and Trustee for Defendant Old Wilson Farm Land Trust, did not appear at said conference despite having been properly notified of same.

> 6.   At the conference the Commissioners and counsel arrived at hearing dates and deadlines for pre-hearing actions and submissions as follows:

> a.   By March 30, 2018, counsel will identify and advise opposing counsel of any depositions that he desire to take in advance of the hearing and all discovery will be completed by May 9, 2018.

> b.   On or before May 16th at 5:00 p.m., counsel will email and deliver a paper version to the Commissioners and exchange with each other -

---

significant litigation experience in diverse real estate-related matters such as eminent domain, property tax assessment appeals, title and boundary disputes, real estate broker's commissions, and leasing. MEYER UNKOVIC SCOTT, https://muslaw.com/member/andrea-geraghty/.

[3] Ms. Datesh is a Shareholder and Director of the firm and a member of her law firm's Corporate, Real Estate, Energy and Natural Resources, and Financial Services Groups with a 30+-year legal career.  Ms. Datesh has worked at law firms and has held a number of executive positions and in-house counsel roles.  She has worked on hundreds of energy-related mergers, acquisitions, dispositions, joint ventures, and surface use and midstream transactions totaling in excess of $11B. SHERRARD GERMAN & KELLY P.C., https://sgkpc.com/attorneys/luann-datesh/.

any Motions in Limine; Pre-hearing statements which should include the names of the witnesses to be called at the hearing; Pre-hearing memoranda to include but not be limited to addressing the issue of whether state or federal law applies to the determination of damages in this matter and outline the differences (if any) in damage calculations under each and whether the Commissioners are bound by the damage numbers submitted by the expert appraisers in determining the damage award or can they award a damage amount that they believe is appropriate based on the evidence; and a binder with numbered exhibits to be submitted at the hearing. The parties' memoranda do not need to repeat law previously presented in briefs to the Commissioners. Also[,] on or before said date counsel will submit one Viewers Plan for the combined Buchanan properties and one for the Old Wilson Farm Land Trust property.

c.   On May 22, 2018, at 9:30 a.m. the Commissioners and counsel will conduct a view of the Buchanan property which is the subject of this action.   Counsel will advise the Commissioners of an appropriate meeting location and counsel for Rover will arrange for transportation. After the view at a location to be determined, the Commissioners will entertain argument from counsel on any Motion in Limine or other pre-hearing matter that needs to be addressed.

d.   On May 23, 2018, at 9:30 a.m. the hearing in this matter will be conducted at the offices of Goehring Rutter & Boehm, 437 Grant Street, 14th Floor, Pittsburgh, PA 15219.

e.   All dates and requirements set forth herein apply to the case involving Old Wilson Farm Land Trust, Lawrence E. Bolind, Jr., Trustee.

ECF 99.

On August 1, 2018, the Commission filed its Second Status Report on the docket.  ECF 101.  In this Report, the Commissioners noted ,in pertinent part, as follows:

4.   A status conference was held at the office of the Commission Chairman on March 15, 2018.  The conference was attended by the three Commissioners and counsel for the parties with the exception of Lawrence E. Bolind, Jr., Esquire; counsel and Trustee for Defendant Old Wilson Farm Land Trust, despite having been properly notified of same.

5.   At said status conference, among other items, May 22 and 23, 2018, were set as the hearing dates in this matter, and were included in the Interim Status Report filed on March 27, 2018.

6. The hearing, including a view of the Buchanan property, occurred as indicated in the previously filed Interim Status Report.

7. The hearing testimony was transcribed by a certified court reporter.

8. As to the Buchanan Defendants, counsel for the parties are in the process of preparing proposed findings of fact and written closing statements after the receipt of which the Commissioners will prepare and file with the Court its opinion and recommended decision.

9. Lawrence E. Bolind, Jr., Esquire, counsel and Trustee for Defendant Old Wilson Farm Land Trust, despite having received notice of the hearing dates, did not appear at said hearing, nor did anyone else on behalf of Old Wilson Farm Land Trust.

10. At the conclusion of the hearing on May 23, 2018, Old Wilson Farm Land Trust, not having appeared or having presented any evidence despite having the burden of proof, Rover Pipeline LLC moved that a nonsuit be entered against Old Wilson Farm Land Trust and that damages for the taking be set in the amount of $5,564.00 as established in the appraisal of Rover's expert, James A. Herbig, SRA.   Rover Pipeline LLC also requested that no current damages be awarded as $125,000.00 was previously paid to Old Wilson Farm Land Trust in conjunction with the condemnation and obtaining Permission for Immediate Access for said property.

11. The Commissioners would recommend that the Court enter an Order consistent with Paragraph 10 above and attach a Proposed Order.

ECF 101.

The Court did enter such an Order on August 2, 2018, and entered a nonsuit in favor of Plaintiff.  ECF 103.  On October 2, 2018, a Motion to Enforce Order of August 3, 2018 (ECF 104) was filed, and the Court issued a Rule to Show Cause ordering that the Buchanan Farm file a statement of reasons as to why it and/or its counsel should not be adjudged in civil contempt for failing to comply with this Court's August 3, 2018 Order.  ECF 105.  On October 12, 2018, counsel for the Buchanan Farm filed a Response to the Rule (ECF 106), and as a result, the Court

dissolved the Rule on October 17, 2018.  Thereafter, the Commission resumed its work with the parties to determine just compensation.

## B. The Commission's Final Report (ECF 108)

On November 15, 2018, the Commission filed its Final Report on the docket.  This Report notes that the Property owned by the Buchanan Farm, and at issue in this case, consists of two tracts of land of approximately 49.571 and 73.874 acres (the "Subject Tracts") for a total of 123.445 acres.  ECF 108, p. 2.  The Commissioners' Report further notes that the Commissioners had viewed not only the Subject Tracts on May 21, 2018, but also, "the development of the surrounding areas, and the character, location[,] and potential of the Subject Tracts were all factors relevant to the disposition of this matter."  Id.  Based in part on their observations, as well as testimony and other evidence presented by the parties, the Commissioners further noted that, "[b]oth Subject Tracts are presently unimproved, mostly woodland, generally rolling with some sloping in certain portions of the Property, and in the 'Clean and Green' program."  Id.

The Commission also held a hearing on May 21, 2018 and May 22, 2019, and all testimony was recorded and transcribed, thereby enabling this Court to review same.  ECF 116. In addition to the site inspection, in their Final Report the Commissioners reference their review of the videotaped depositions of James Herbig, Rover's expert, and Anthony Barna, the Buchanan Farm's expert.  The Commission also heard testimony from Rover's witness, Richard Huriaux, and Rover's representatives, Messrs.  Chris Lason and Mathew Florian.  Testifying on behalf of the Buchanan Farm were Ms. Diane Buchanan and Mr. James Buchanan.

Based on their own observations as well as the testimony and other evidence from the hearing, the Commissioners found the following as facts relevant to their analysis:

**Finding No. 1:  Pre-Take Highest and Best Use.**

The parties disagree as to the highest and best use of the Property before the taking.  Buchanan Farm assembled that the highest and best use before the taking was for a 157-lot subdivision (Hr'g Tr. 270), whereas Mr. Herbig, Rover's appraiser, testified that a presumption exists that the current use, rural residential, is the highest and best use of the Property. (Hr'g Tr. 29).

The proposed high-density subdivision plan presented during the testimony of Mr. Barna, Ms. Buchanan, and Mr. Buchanan was not created until June 2017, a few months after Rover's taking of the Easements, and about two years after Buchanan Farm first learned of the proposed Rover project.  (Hr'g Tr.  159-160;  Defs.' Ex. 24). The subdivision plan was never approved or even submitted to the appropriate authorities for any kind of vetting or approval, nor was any evidence submitted as to the probability that the plan would be approved.   (Hr'g Tr. 161-162, 332).   Moreover, Buchanan Farm and Mr. Barna admitted that, aside from a letter to inquire about sewage plant capacity and drawing the 157-lot plan, no engineering, geotechnical, wetland, or any other studies have ever been conducted, nor has there been any surveying or staking of the proposed lots or other acts taken in furtherance of a residential subdivision.  (Hr'g Tr. 161-163, 332, 335).  In the twenty-two years that Buchanan Farm owned the Property, it had never been marketed for sale as a location for subdivided residential units that would meet the requirements of the high-density subdivision plan. (Hr'g Tr. 164-165).

\*       \*       \*

. . . Here, Buchanan Farm has not taken any significantly "meaningful steps" for the development of the high-density subdivision.

Moreover, Buchanan Farm has not proven that a market demand existed as of the date of the taking for the proposed 157-lot subdivision. Although Mr.  Barna testified at length about the "economic drivers" in the area, the objective data shows a population decline trend for a number of years, and only a slight forecast for an increase in the future. (Herbig Dep.  78).  One of the "economic drivers" that Mr. Barna pointed to was Starpointe Business Park. That Business Park, however, has been in place since at least the end of 1990. (Barna Dep. 61, Jun. 22, 2018). There was no evidence of an increase in home sales during the period when Starpointe Park was in the vicinity of the Property. Id. at 64.

Similarly, there was no objective evidence that the market would support the 157-lot proposed subdivision based on its affordability.  Mr. Barna projected an average lot price of $85,000, but the evidence offered

on behalf of the Buchanan Farm was not sufficient to show comparable subdivision residential sales from which to justify an $85,000 lot price. Based on Mr. Barna's estimated lot price of $85,000, Mr. Herbig calculated that home prices would need to be in the $275,000 to $475,000 price range. Home pricing within a 5-mile radius of the Property is about $125,000. (Herbig Dep. 82). The median income of approximately $55,000 in the area surrounding the Subject Tracts (Herbig Dep. 82) does not support the projected $85,000 lot sales price.

However, evidence was offered that persuaded the Commission of the desirability of the area for less dense residential and recreational uses. In this regard, Mrs. Buchanan explained that the conservation areas, parks, golf courses and other recreational amenities make the Property particularly attractive to potential buyers who are looking for space without high tax burdens and proximity to work. (Hr'g Tr. 210-212). Similarly, nearby game lands and state parks (Hr'g Tr. 88-91), shopping and entertainment venues (Hr'g Tr. 96) employment opportunities and easy access to highways and the Greater Pittsburgh Airport also enhance the desirability and value of the Property. (Hr'g Tr. 95-96).

While there was insufficient evidence to conclude that the Property's highest and best use before the taking was for a high-density residential subdivision, the evidence supports the use of the Property for a less dense multi-family residential use. Accordingly, the Commission unanimously determines that the pre-taking highest and best use of the Property is rural recreational and residential uses, which includes a less dense multi-family residential and recreational use.

Having determined the highest and best use, the Commission reviewed the offered evidence on value. Mr. Herbig offered pre-taking comparables in a range between $2,500 to $4,800 per acre (Herbig Dep. 39) based on a highest and best use of rural residential and the undeveloped state of the Property. However, the Commissioners find that the adjustments made for these comparables did not fairly take into consideration the distance of the comparables from the Property, the size of the comparable properties, and the access to highways and other economic drivers. On the other hand, the appraisal performed by Mr. Barna provided pre-taking comparables in a range between $6,300 to $18,600 per acre (Hr'g Tr. 288-289) based on a highest and best use of high-density residential subdivision. Mr. Herbig separately appraised the two Buchanan tracts and concluded that the before-taking value of the 49.571-acre tract was $3,600 per acre, and the before taking value of the 73.784-acre tract was $3,400 per acre, for total tract values of $178,460 and $251,170, respectively, for a total before-taking value of $429,630. (Hr'g Tr. 33-37). Mr. Barna's before-taking value was $1.1 million. (Hr'g Tr. 289).

In light of the appraisals and testimony, the Commissioners find that the values offered by Mr. Herbig are understated and those provided by Mr. Barna are overstated. After considering all comparables offered by the expert appraisers, the testimony offered at hearing and considering the location, the surrounding uses, amenities and development, the access, parcel size, economic drivers, the topography, the recency of the sales and prices, and other factors that would be given substantial weight in the acquisition of land, the Commissioners conclude that the value per acre of the Property at the time of taking is $6,400 per acre.

**Finding No. 2: Post-Take Highest and Best Use.**

There was conflicting testimony as to use of the Property subsequent to the taking. Mr. and Ms. Buchanan and Mr. Barna all testified that they believed that the existence of the Rover Pipeline made the Property no longer developable as a residential subdivision. (Hr'g Tr. 244). Mr. Barna opined, based on a conversation with one unidentified developer and such developer's alleged subjective beliefs, that because of the presence of a pipeline on the property, no developer would invest in the property. (Hr'g Tr. 304, 310). Mr. Herbig disagreed, and Rover argued that the pipeline had no such impact on the development of the Property. (Herbig Dep. 51-52).

Buchanan Farm further attributed the alleged undevelopability of the Property to the restrictions on its possible uses of the pipeline right-of-way. Based on communications with Rover's representatives, Buchanan Farm understood that it would not be able to bring electric lines, sewer, or other utilities, or build roadways across the Permanent Pipeline Easement, and that this would effectively isolate the northern part of the Property. Rover claimed that the language of the Complaint does not impose material restrictions on the uses of the Property.

\*      \*      \*

. . . The limitations imposed upon the servient tenement, Buchanan Farms, by the dominant tenement, Rover, are far more extensive than those typically found in a generic easement.   These limitations may be necessary and appropriate for high pressure gas line installation and maintenance; however these limitations do have a significant negative impact on the post-taking value of the Buchanan Farms property. Specifically, the provisions of paragraph 37 of the Complaint demonstrate that Buchanan Farm's ability to construct roads and utilities across the easement is not unfettered, and, in fact, is restricted in multiple ways and subject to factors and decision-making discretion of Rover and others:

Defendants (i) may use lands lying within the Permanent Pipeline Easements and Permanent Road Access Easements for all purposes **which do not destroy or interfere with Rover's permitted uses of same,** including, without limitation, agricultural, open space, setback, density, street, utility, and roadway purposes; (ii) **after review and approval by Rover which will not be unreasonably withheld**, may construct and install any and all streets and roadways, at any angle of **not less than forty-five degrees (45°) to Rover's Facilities**, across the Permanent Pipeline Easements **which do not interfere with, damage, destroy or alter the operation of the Facilities**; (iii) may construct and/or install water, sewer, gas, electric, cable TV, telephone or other utility lines across the Permanent Pipeline Easements at any angle of **not less than forty-five degrees (45°) to Rover's Facilities**, across the Permanent Pipeline Easements **which do not interfere with, damage, destroy or alter the operation of the Facilities**, and provided that **all of Rover's required and applicable spacings, including depth separation limits and other protective requirements are met**; and (iv) may construct and/or install water, sewer, gas, electric, cable TV, telephone or other utility lines across the Permanent Road Access Easements so long such construction, installation, and maintenance of **same does not unreasonably interfere with Rover's use of same, or damage or destroy the roads located within such easements**.

(Pl.'s Comp1. ¶ 37) (emphasis added).

Moreover, in many cases, a condition precedent to the exercise of the limited rights retained by Buchanan Farm is the prior approval of Rover. In certain situations, whether to grant approval is in the sole judgment of Rover. (*See, e.g.,* Pl.'s Compl. ,¶¶ 39, 40).

According to Rover's expert Huriaux, if houses were built as contemplated by Buchanan Farm, the Property would be within a Class 3 High Impact Area, which would trigger higher requirements on Rover's part, "such as thicker walled pipe and so on." (Hr'g Tr. 464). This might require Rover to change operation or construction of the pipeline and other facilities (Hr'g Tr. 465), most likely at great expense, making it unlikely that Rover would give its unilateral consent to roads or utilities crossings, particularly without requiring that Buchanan Farm pay for the costs that would be incurred.

Hence, the Commission unanimously determines that the highest and best use after the taking is for long-standing existing rural recreational and residential uses. The Commission finds that while the Property is not rendered undevelopable, the various restrictions on the landowner's right and on the ability to construct roads and utilities across the easement interfere with what would otherwise be Buchanan Farm's unfettered ability to use, enjoy and develop the Property and that such restrictions have an adverse effect on the value and desirability of the Property to a knowledgeable and prudent purchaser. The Commission further concludes that the mere presence and location of a pipeline creates uncertainties and would impact development of the Property and cause a diminution in value of the residue.

Having determined the post-taking highest and best use, the Commission considered the evidence offered by the parties on the question of value. Mr. Herbig offered post-taking comparables in the same range as his pre-taking comparables of $2,500 to $4,800 based on a highest and best use of rural residential: resulting in a per acre post-taking value of $3,400 to $3,600 per acre. (Herbig Dep. 39-44). Mr. Barna generally agreed and provided post-taking comparables in a range between $3,000 to $4,000 (Hr'g Tr. 312-313) based on a highest and best use of agricultural, conservation, recreational or single-family residence. Id. Thus, the comparables applicable to post-taking value ranged between $2,500 and $4,800.

In light of the limitations on the use of the Property, and after considering the uncertainty of development opportunities due to the approval rights of the dominant tenement, the restrictions necessitated by the nature of the high-pressure interstate natural gas transmission pipeline, and considering its location, high pressure, size, and future access and maintenance requirements, the Commissioners find that the foregoing have a material adverse effect on desirability, use and value, resulting in a post-taking value of $3,400 per acre.

ECF 108, p. 6-13.

Based on these factual findings, the Commission drew the following conclusions:

1. The conclusions of the Commission in this case were, in all relevant respects, unanimous.

2. The parties agreed and the Commission therefore finds that the date of the taking was February 24, 2017.

3. The Commission finds that the pre-taking highest and best use of the Property is for rural recreational and residential uses.

4.   The Commission finds the fair market value of the Property, as a whole, immediately prior to the taking to be **$790,048.00**.   [$6,400 x 123.445 acres]

5.   The Commission finds that the post-taking highest and best use of the Property is for rural recreational and residential uses.

6.   The Commission finds the fair market value of the Property after the taking of the Permanent Pipeline Easement to be **$419,713.00** [$3,400 x 123.445 acres].   The Property and such use after taking is impacted and devalued by the limitations imposed upon the servient tenement.

7.   The Commission finds the just compensation for the condemnation of the Permanent Pipeline Easement, as of the date of taking of February 24, 2017, to be **$370,335.00**.

8.   The Commission finds the just compensation for condemnation of the Temporary Work Space Easement to be to be **$4,224.00** which is determined by taking the $6,400 per acre amount  the Commission determined to be the before-taking value of the land, and then multiplying this figure by 10% and then by the 3.3, the Temporary Work Space Easement acreage, and then by 2 (the number of years the land is subject to the Temporary Work Space Easement).

9.   The Commission therefore finds the total just compensation for the condemnation of the Easements, as of the date of taking of February 24, 2017, to be **$374,559.00** comprised of: (a) $370.335.00 for the Permanent Pipeline Easement which consists of the difference between the value of the Property, as a whole, before the taking and the value of the Property after the taking, and (b) $4,224.00 for the Temporary Work Space Easement.

10.  Rover has made a payment of **$65,628.00** to Buchanan Farm for the Permission for Immediate Access dated February 23, 2017.  Accordingly, the Commission finds that Rover owes Buchanan Farm the remaining balance of the just compensation award, which remaining balance is **$308,931.00**.

11. The Commission finds no law to support an award of attorney's fees or other professional fees or costs as part of just compensation.  Moreover, no evidence was offered to support an award of attorney's fees or other professional fees or costs.

ECF 108, p. 13-15 (emphasis in original).

### III. Analysis

Following the Commission's filing of its Report, Rover filed a set of Objections to same. ECF 111.  Similarly, the Buchanan Farm filed Objections to the Commission's Report. ECF 113. The Court will discuss the parties' Objections, *seriatim*, below.

#### A. Rover's Objections

Rover raised three objections arguing that: (1) the Commission improperly considered "stigma" or "fear" evidence in arriving at its determination of post-taking value;  (2) the Commission's conclusions regarding restrictions on the Buchanan Farm's use of its Property were purely speculative and contrary to the express language of the Complaint and the objective evidence; and (3) the Commission's determination of the pre-taking highest and best use, as including a less dense multi-family residential and recreational use, was unsupported by any evidence and improperly inflates the pre-taking valuation.  ECF 111 p. 3.

In condemnation actions such as this one, brought in accordance with the Natural Gas Act, the landowner has the burden of proving just compensation owed for the condemned property.  *United States v. 33.92356 Acres of Land*, 585 F.3d 1, 7 (1st Cir. 2009); *United States v. 68.94 Acres of Land*, 918 F.2d 389, 392 (3d Cir. 1990).  Just compensation is measured by "the fair market value of the property on the date it is appropriated."  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 9-10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (citations and internal quotation marks omitted).  Fair market value is determined by considering the property's "highest and best use," which means that the landowners whose property is condemned must "receive the value of the highest and best use for which the property is adaptable in the reasonably near future from the vantage point of the date of the taking."  *68.94 Acres*, 918 F.2d at 393 (citing *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)).

The "guiding principle" of just compensation is that the property owner "must be made whole but is not entitled to more." *United States v. 6.45 Acres of Land*, 409 F.3d 139, 145 n.11 (3d Cir. 2005). *See also, Columbia Gas Transmission, LLC v. An Easement To Construct Operate & Maintain a 20 Inch Gas Transmission Pipeline Across Properties in Washington Cty., Pennsylvania By Quarture*, 745 F. App'x 446, 449-50 (3d Cir. 2018). A landowner may establish just compensation through expert testimony as to the property's value before and after the taking, but "mere speculative uses of the property should not be entertained by the factfinder." *68.94 Acres*, 918 F.2d at 393.

### 1. "Stigma" or "Fear" Evidence

Rover's first objection to the Report argues that the Commission improperly considered "stigma" or "fear" evidence to arrive at the post-taking land value. In making this first argument, Rover relies upon two unreported decisions, one rendered by the United States District Court for the Southern District of Indiana, and the other decided by the United States District Court for the Southern District of Ohio. Rover cited these cases for the proposition that the Commission in this case improperly considered "stigma" or "fear" evidence when it determined the post-taking value of the Buchanan Farm. See ECF 111, p. 7-8, citing to *Rockies Express Pipeline LLC v. Hopkins,* No. 1:08-cv-00751-RLY-DML, 2012 U.S. Dist. LEXIS 65122 (S.D. Ind. May 9, 2012) and *Rockies Express Pipeline, LLC v. 4.895 Acres of Land*, No. 2:-8-cv-554, 2011 U.S. Dist. LEXIS 27568 (S.D. Ohio Mar. 16, 2011). Specifically, Rover claims that these cases stand for the proposition that a fact-finder in a Natural Gas Act just compensation case cannot consider the fear people may have and/or the stigma which follows condemnation of real property because of the existence of a pipeline on that property. Rover suggests that the above-cited cases label such evidence as speculative and, therefore, inadmissible.

Despite the fact that neither of these decisions are binding on this Court, the Court reviewed the cases, but is not entirely persuaded by them. Rather, the Court's own research led the Court to a more recent decision, one rendered by Judge Matthew Brann, a District Judge in the United States District Court for the Middle District of Pennsylvania, who held as follows:

> Plaintiff further anticipates that the Defendants will attempt to offer evidence at trial regarding the purported dangers that natural gas pipelines present in an attempt to establish a diminution in value of their respective properties. Because it alleges that Defendants' expert opinion fails to establish the requisite nexus between property values and the alleged stigma pipelines create, it suggests that such testimony be excluded.

> The Court has reviewed the pertinent portions of Mr. Mignogna's deposition testimony and agrees that the nexus between generalized fears or stigma damages and Mr. Mignogna's valuation is unclear and sometimes minimized by Mignogna's own observations. Nevertheless, as stated earlier, the task of evaluating the bases for Mr. Mignogna's valuation rests solely with the jury, his analysis having cleared the threshold *Daubert* analysis.

> Thus, counsel for Columbia Gas is free to cross-examine Mr. Mignogna on the extent to which stigma damages truly bear in any objective manner on the calculations contained within his report.

*Columbia Gas Transmission, LLC v. 101 Acres & 41,342 SQ. Ft. More or Less in Heidelberg Twp., York Cty., Pennsylvania*, No. 4:13-CV-00783, 2016 WL 6248071, at *6 (M.D. Pa. Oct. 26, 2016).

This Court concurs with the overall principle set forth in *Columbia Gas*. Specifically, that evaluating the bases for an expert's valuation (once the person is qualified as an expert) lies with the factfinder – in this case the Commission, and now, this Court.

As applied to the instant matter, the Commission had an opportunity to weigh the testimony of the Buchanan Farm's expert, Anthony Barna, a professional appraiser with the firm of Kelly Reilly Nell Barna Associates, after Rover had ample opportunity to cross-examine him. It is true that Mr. Barna, as well as Mr. and Mrs. Buchanan, testified that existence of the

pipeline made the property undesirable and unable to be developed to the fullest extent of its potential.  It is clear from the Report that the Commission took note of this testimony and even commented that Mr. Barna alluded to the diminution of value of the Property because of the pipeline's mere existence.  However, it is equally clear that the Commission did not ascribe much, if any weight to this sort of  "stigma" or "fear" testimony.  In fact, the Report largely discredited this portion of Mr. Barna's testimony, noting that Mr. Barna based his testimony that the land was not developable as a residential subdivision based upon a conversation "with one unidentified developer and such developer's subjective beliefs . . ." concerning the existence of a pipeline on the Property.  ECF 108.

Accordingly, the Commission did rejected the portion of Mr. Barna's testimony which was based upon the "one unidentified developer," who seemed to  have an opinion that the pipeline diminished the value of the Property, and neither does this Court.  Although Rover labels this portion of Mr. Barna's testimony (referenced in the Commission's Report) "stigma" or "fear" evidence, this Court chooses to disregard the evidence because there is little to no scientific basis for Mr. Barna's conclusion that the Buchanan Farm at issue is now "undevelopable."

However, as the Commission's Report notes, and as this Court also finds, the Buchanan Farm faces significant impediments to its development as a residential subdivision because of the many conditions precedent which must be met in order for Buchanan Farm, or any future developer, to exercise their limited rights retained after Rover's taking of Property.  The Court concurs with the Commission's finding that the "limitations imposed upon the servient tenement, Buchanan Farms, by the dominant tenement, Rover, are far more extensive than those typically found in a generic easement."  ECF 108.  In addition, the Court also concurs with the portion of

the Commission's report which noted, "if houses were built [on the Property] as contemplated by Buchanan Farm, the Property would be within a Class 3 High Impact Area, which would trigger higher requirements on Rover's part, such as thicker walled pipe and so on." Id. The likelihood of Rover approving such a use would require Rover to change its operation or construction of the pipeline at great expense, then Rover would most likely not give its consent to such land use.

None of these findings turn on any "stigma" associated with the pipeline, or "fear" of the existence of a gas pipeline on the Property as Rover suggests. These findings are based on the conditions precedent which are extensive and exist in the easement allowing Rover to limit the use considerably. These are solid bases upon which this Court (and Commission) forms its opinion as to the post-taking land value.

Moreover, despite arguing that the Commission improperly relied upon "stigma" and "fear" evidence, Rover admits that "the Commission did not explicitly state [that it had] considered 'stigma' or 'fear' in arriving at its post-taking value." ECF 111, p. 6. Rather, Rover predicates its Objection relating to "stigma" and "fear" evidence on its belief that the Commission did so.

This Court disagrees with Rover that "stigma" and "fear" evidence were used by the Commission in determining the post-taking value of the Property. To the contrary, the Court finds that even though the Commission noted that Mr. Barna alluded to the opinion of "one unnamed developer," the Commission quickly discredited this portion of Mr. Barna's testimony in their Report. Instead, the Commission relied upon sound factors such as the onerous and extensive conditions precedent placed on the easements which afford Rover great power to prevent the Buchanan Farm from using the land as a residential subdivision. Accordingly, this

Court concurs that the evidence supports the Commission's finding on post-taking value, and

reiterates that which the Commission stated at the end of the factual finding number 2:

> In light of the limitations on the use of the Property, and after considering
> the uncertainty of development opportunities due to the approval rights of
> the dominant tenement, the restrictions necessitated by the nature of the
> high-pressure interstate natural gas transmission pipeline, and considering
> its location, high pressure, size, and future access and maintenance
> requirements, the Commissioners find that the foregoing have a material
> adverse effect on desirability, use and value, resulting in a post-taking
> value of $3,400 per acre.

ECF 108. Accordingly, after conducting a *de novo* review, Rover's first Objection is overruled

and Court adopts the Commission's factual finding number 2 in its entirety.

### 2. Conclusions Regarding Farm Use

Rover's second objection concerns the Commission's conclusions whereby the

Commission found that there would be restrictions on the use of the Property. Specifically,

Rover challenges these conclusions as "speculative" and claims that these conclusions are, in

some instances, predicated on "unfounded assumption[s]." ECF 111. Moreover, Rover argues

that the Commission's conclusions are contrary to the express language of the Complaint, noting

that case law suggests that the express language of the Complaint defines the rights that Rover

condemns. Id. The Court finds that Rover's recitation of the law is correct, albeit somewhat

incomplete.

In *Columbia Gas Transmission, supra,* Judge Brann noted:

> Federal Rule 71.1 dictates that the complaint in condemnation "contain a
> short and plain statement of . . . the interests to be acquired." As the
> Supreme Court has stated, that rule "requires the filing in federal district
> court of a 'complaint in condemnation,' identifying the property and the
> interest therein that the United States wishes to take." I therefore agree
> with Defendants' argument that "[w]hat controls is the acquired rights, not
> intent." Of course, Plaintiff remains free to advance factual arguments
> relating to the burden on the land caused by the condemnation, such as

whether the right-of-way agreements preclude the use of Defendants' farm machinery.

2016 WL 6248071, at *10 (footnotes and citations omitted).

This Court, again, concurs with outcome of *Columbia Gas* with respect to this issue, as well as the application of the law announced above to facts that arise during condemnation proceedings. Simply put, while the Complaint in this case "outlines" the rights to be acquired by Rover, the Buchanan Farm was free to advance argument relating to the burdens caused – either directly or indirectly – by the condemnation proceedings. If the Commission considered any or all of the Buchanan Farm's arguments advanced by it and/or its expert, which described the burdens directly or indirectly caused by the condemnation of the land, this consideration does not automatically render the Commissions findings "speculative" or "unfounded."

The Court's review of the Complaint filed in this case identifies numerous rights which Rover sought to acquire. A <u>sample</u> of a <u>few</u> of those rights is set forth herein[4]:

> 38. . . . Defendants must notify Rover in writing before the construction or installation of any streets, roadways, utilities or other encroachments on the Permanent Pipeline Easements and/or the Permanent Road Access Easements.
>
> 39. Defendants may not use any part of the Permanent Pipeline Easements and/or the Permanent Road Access Easements if such use may damage, destroy, injure, and/or interfere with the Rover's use of same . . . . Defendants . . . are not permitted to conduct any of the following activities on the Permanent Pipeline Easements and/or the Permanent Road Access Easements without the prior written permission from Rover: (i) construct any temporary or permanent building or site improvements, other than streets and roads as provided above; (ii) drill or operate any well; (iii) remove soil or change the grade or slope; (iv) impound surface water; or (v) plant trees or landscaping. Notwithstanding anything herein to the contrary, no above or below ground obstruction that may destroy or materially interfere with Rover's permitted uses shall be placed, erected, installed or permitted within or upon the Permanent Pipeline Easements

---

[4] As noted by the Commission, there are 19 paragraphs in the Complaint prepared by Rover which specify all of the restrictions placed on the Buchanan Farm Property. Thus, the portions of the three paragraphs from the Complaint (above) are just a sample of the total restrictions placed on the Property by Rover.

and/or the Permanent Road Access Easements without the prior written permission of Rover. In the event the terms of this paragraph are violated, Rover shall have the immediate right to correct or eliminate such violation at the sole expense of Defendants.

40. Rover has the right from time to time on the Permanent Pipeline Easements, Surface Site Easements, and/or the Permanent Road Access Easements to trim, cut down or eliminate trees or shrubbery . . . the right to remove or prevent the construction of any and all buildings, structures, reservoirs or other obstructions on the Permanent Pipeline Easements and/or the Permanent Road Access Easements that, in the sole judgment of Rover, may endanger or interfere with the efficiency, safety or convenient operation of the Facilities.

ECF 1.

The objective evidence of record includes the inspection performed by the Commissioners themselves as well accepting testimony from the parties' representatives and the parties' experts. This evidence, upon this Court's review of same, supports the conclusions the Commission drew relating to the extremely restrictive nature of the easements acquired by Rover.

For example, the Buchanans were initially informed by Rover that the pipeline was to go across the northeast corner of the larger of the two parcels which comprise the Buchanan Farm Property; however, the pipeline's location had to be moved because of a cemetery. ECF 116-1, p. 108-109. As a result, the pipeline (along with all of its temporary and permanent restrictions) had to be moved to a more central location within the Property, according to Mr. Buchanan. Id., p. 109. Mr. Buchanan further testified that he was told by a Rover representative that no roads could be built over Rover's permanent pipeline easement. Id. at 111.

The two-day transcript is replete with examples such the one above. ECF 116-1 and ECF 116-2. The pipeline easement and restrictions associated therewith essentially isolated a large swath of the northern portion of the Buchanan Farm Property because no roads, electric lines,

sewer lines or other utilities could cross the pipeline easement.  Id.  Moreover, the record is clear

that the Buchanans purchased the Buchanan Farm Property as an investment, and this R-1 zoned

Property allowed for the development of single-family dwelling(s) on the Buchanan Farm

Property.  Thus, because of the final location of the pipeline easement, no such development can

occur in the northern portion of the Property.  Accordingly, this Court concurs with the

Commissioners' conclusion that the Property's highest and best use of the Property (pre-taking

and post-taking) was for rural and recreational use – which by definition, includes multi-family

residential and recreational use .

That said, the Court also agrees with the Commissioners' finding that although  the

Property was not rendered completely undevelopable by the pipeline easement, "the various

restrictions on the Buchanans' right[s] and on the ability to construct  roads and  utilities  across

the easement  interfere with what would otherwise be Buchanan Farm's unfettered ability to use,

enjoy and develop the Property and that such restrictions have an adverse effect on the value and

desirability of the Property to a knowledgeable and prudent purchaser."  ECF 108, p. 12-13.

Finally, the Court further concurs with the Commission's finding that the "presence and

location of a pipeline creates uncertainties" which "would impact development of the Property

and cause a diminution in value of the residue."  Id., p. 13.  Importantly, as noted in the

Commission's report, Rover's expert testified that the pipeline easement would create no impact

on the development of the Property, yet Rover's Complaint clearly asserts that the Buchanan

Farm (their developer, or any future developer) would not be permitted to construct temporary or

permanent buildings, grade soil, plant trees, landscape, etc., "without the prior written permission

from Rover."  ECF 1, ¶ 39.  This Court finds that the requirement of "prior written permission,"

from Rover to perform any work that a developer would need to perform in order to develop the

Buchanan Farm Property for any purpose, absolutely "create[d] uncertainties" as found by the Commission. If Buchanan Farm was uncertain whether Rover would grant permission to develop its own land within the vicinity of the pipeline, this uncertainty has the effect of diminishing the Property's value.

Accordingly, Rover's second objection is overruled and this Court adopts the second factual finding of the Commission and its conclusions of law relating to same in their entirety.

### 3. Conclusions Regarding Pre-Taking Highest and Best Use

Rover's final objection concerns the Commission's determination that the pre-taking highest and best use of the Property included a "less dense multi family residential and recreational use." ECF 111, p. 25-29. More specifically, Rover complains that given the dollar values ultimately used by the Commission to determine the pre-taking value of the Property, it "appear[ed]" to Rover that the Commission was attempting to improperly "split the baby" based on speculative evidence and a use for which neither party had advocated.

In this case, the Commissioners as fact-finders weighed two conflicting expert reports and various expert opinions. Rover's expert saw the Buchanan Farm Property's current use (rural residential) as the highest and best pre-taking use of the Property. The Buchanans' expert testified that the highest and best use of the Property was for high density (a 157-lot) subdivision. The Commission disagreed with both experts as to the highest and best use of the Property, pre-taking – specifically finding that Rover's expert understated the value, while the Buchanan Farm's expert overstated the value. Moreover, the Commission completely discounted the opinion of the Buchanans' expert's opinion that a subdivided 157-lot was the highest and best use of the Property before the taking, finding this opinion to be speculative.

However, the Commission found Mrs. Buchanan's testimony compelling when she testified that the Property was desirable for some less dense residential and recreational uses. As the Commission noted, "In this regard, Mrs. Buchanan explained that the conservation areas, parks, golf courses and other recreational amenities make the Property particularly attractive to potential buyers who are looking for space without high tax burdens and proximity to work." ECF 108, p. 8. The Commission also noted that its own observations and evidence of nearby game lands and state parks, shopping and entertainment venues, as well as employment opportunities and "easy access to highways" and the airport, enhanced the desirability, and thus, the value of the Buchanan Farm Property. ECF 108, p. 9.

In addition, the Court concurs that the evidence of record suggests that when Rover's expert placed a value on the Buchanan Farm he failed to properly consider the distance of his comparables to the Buchanan Farm, the size of his comparables to the Buchanan Farm, and the access to highways and other economic drivers in relation to the Buchanan Farm. As a result of Mr. Huriaux's incomplete considerations when deriving his value, the Commission could not adopt Mr. Huriaux's valuation of the Buchanan Farm without adjusting same upward.

Given the Commission's observations of the Property and surrounding areas (including the proximity of businesses, entertainment venues, recreational spaces, and the proximity of various transportation routes), as well as the credible testimony of Mrs. Buchanan, as well as the other evidence which did not support Mr. Huriaux's valuation determination, this Court concurs that evidence of record supports the conclusion that the highest and best use of the Property (pre-taking) included a "less dense multi[-]family residential and recreational use."

Despite the fact that final determination made by the Commission as to the post-taking value was a value that rests between the two experts' conflicting values, there is ample record to

support the Commission's ascribed value.  Accordingly, this Court overrules Rover's third

objection to the Report, and adopts the Report of the Commissioners, in its entirety.


### B. The Buchanan Farm's Objections

The Buchanan Farm also filed objections to the Commissioners' Report.  ECF 113.  First,

the Buchanan Farm objected to the Commission's failure to include several of the Buchanan

Farm's proposed findings of fact.  Although there are many proposed findings the Buchanan

Farm references, the Buchanan Farm did not offer any basis as to why the Commission erred in

not adopting them, nor why this Court should do so.  In addition, the Buchanan Farm did not

explain how the Commission's adoption of these ignored proposed findings would have led to a

different valuation outcome.  Moreover, the he Court notes that the Commission, as the fact-

finder, was free to adopt in whole or in part any proposed factual finding which it deemed to be

true, accurate, and relevant to the issues before it.  There is no obligation on the part of the

Commission to respond to every proposed factual finding submitted by any party.

Next, the Buchanans, like Rover, objected to the pre-taking highest and best use of the

Property.  This Court has already carefully reviewed the portion of the Commission's Report

which set the highest and best use of the Property (see "A. Rover's Objections," above) and has

concluded that there exists ample and substantial evidence in support of the findings and

conclusions of the Commissioners with respect to the highest and best use of the Buchanan Farm

Property, pre-taking.  Moreover, to the extent that the Buchanan Farm argues that the testimony

of either Mr. or Mrs. Buchanan was not meaningfully considered or taken into account by the

Commissioners with respect to the highest and best use of the Property, the Court utterly

disagrees.  The Commission very carefully considered their testimony and partially relied upon

Mrs. Buchanan's testimony to establish a post-taking value. Accordingly, the Buchanans' objections are overruled on this matter.

The Buchanans further contend that the Commissioners erred in determining that the Buchanans had not taken "meaningful steps" to utilize the Property for a residential subdivision. The Buchanans argue that "the four-factor test" does not include consideration of any "meaningful steps" they took or failed to take with respect to developing the Buchanan Farm Property prior to the taking. This Court first notes that the "four factor test," to which the Buchanans refer, is really a four-step process used by appraisers to value property, and thus, it is not a binding legal standard to be employed by a fact finder in a condemnation proceeding to establish highest and best use. The Court also notes that the law governing highest and best use forbids a fact-finder from basing a fact or conclusion as to the value upon mere speculation. *See 68.94 Acres, supra.,* 918 F.2d at 393. Merely because the Buchanans could have used the Property for a high density, residential subdivision prior to the taking, is not sufficient to value the land under that rubric. The reality is the land was not used, nor had any work whatsoever been performed to ready the Property (pre-taking), so as to enable the Property to be used, as a 157-lot subdivision. Thus, any valuation based on a 157-lot residential subdivision would, indeed, be speculative and, therefore, violative of the law governing condemnation pre-taking valuation. Accordingly, this Court finds that the Commission properly disregarded such speculative evidence when assigning the Property's pre-taking value.

Of the twenty-two additional objections raised by the Buchanan Farm, this Court notes that some of the objections rely upon the "four factor test" which this Court has already stated is not the proper legal standard. Others call into question the Commissioners' credibility findings with respect to Mr. Barna (the Buchanans' expert) as well as their decision to disregard certain

pieces of documentary evidence. This Court finds that, based on the record evidence, it concurs with the Commissioners' decisions with respect to the portions of Mr. Barna's testimony they chose to accept and those they chose to reject or disregard. Similarly, the Court finds no abuse of discretion with the Commissioners' decision to include as well as exclude certain pieces of evidence.[5]

In addition, the Buchanan Farm also objected to the Commissioners' decision to not recommend that the Buchanans' attorneys' fees be paid by Rover. The Buchanan Farm cites no authority for the proposition that it is entitled to same from Rover. Thus, this Court will not impose any requirement that Rover pay the Buchanan Farm's attorneys' fees.

The Court, in short, after reviewing all of the objections raised by the Buchanan Farm overrules each one and adopts the Commissioners' Report (ECF 108) and all of its findings of fact and conclusions of law without any modifications.

**IV. CONCLUSION**

After conducting a *de novo* review of the evidence, this Court hereby adopts the Commission's Report filed at ECF 108 in its entirety. An appropriate Order of Court setting forth the just compensation shall follow.

s/ Arthur J. Schwab_____
Arthur J. Schwab
United States District Court Judge

cc:     All ECF registered counsel of record
        Andrea Geraghty, Esquire
        LuAnn Datesh, Esquire
        Thomas T. Frampton, Esquire

---

[5] The Buchanans primarily objected to evidence which was submitted to the Commissioners but not "timely disclosed" to the Buchanans.